MISSOURI PACIFIC RAILROAD COMPANY *v.* BARRY.

Opinion delivered January 31, 1927.

1. APPEAL AND ERROR—CONCLUSIVENESS OF VERDICT.—The Supreme Court will not set aside the verdict of a jury if there is substantial evidence to sustain it.

2. APPEAL AND ERROR—VERDICT—SUFFICIENCY OF EVIDENCE.—In determining the sufficiency of evidence to sustain a verdict, the Supreme Court must give the evidence its strongest probative force in favor of the verdict.

3. TRIAL—FUNCTION OF JURY.—The jury are the sole judges of the evidence and of the credibility of the witnesses.

4. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE AS DEFENSE.— Proof that plaintiff employee, injured while engaged in interstate commerce, was guilty of contributory negligence will not debar recovery by him where there was evidence that other employees were guilty of negligence which proximately concurred in causing the injury.

5. MASTER AND SERVANT—EMPLOYMENT IN INTERSTATE COMMERCE.— Evidence *held* to warrant a finding that an engine hostler taking an engine from the roundhouse to haul a train carrying interstate shipments was engaged in interstate commerce.

6. EVIDENCE—EXPERT TESTIMONY.—In an action by an employee for injuries resulting from a collision between locomotives, expert testimony as to the manner in which the collision occurred was incompetent, since the facts of the occurrence were not beyond the knowledge and experience of an ordinary man to understand and draw conclusions from them, when detailed by eye-witnesses.

7. TRIAL—INSTRUCTION—WAIVER OF OBJECTIONS.—Where specific objections were taken to an instruction, an objection not thus pointed out will be deemed waived.

8. DAMAGES—WHERE NOT EXCESSIVE.—$5,500 as damages for intense personal suffering, with permanent injury to the pelvis, *held* not excessive.

Appeal from Saline Circuit Court; *Thomas E. Toler,* Judge; affirmed.

*E. B. Kinsworthy,* for appellant.

*Mehaffy & Mehaffy,* for appellee.

WOOD, J. M. Barry instituted this action against the Missouri Pacific Railway Company, a corporation, to recover damages for personal injuries. He alleged in substance that, on August 20, 1924, he was employed by the Missouri Pacific Railway Company, a corporation, engaged in interstate commerce, and, as such employee, was engaged in interstate commerce in operating an engine and cars of the railroad company; that, while so engaged, another employee of the company operating another engine in defendant's yards near North Little Rock, negligently and wrongfully caused that engine to run against the engine operated by the plaintiff; that the collision thus caused by the other employee broke the steam-pipe on that engine, and plaintiff was thrown from his engine and scalded on his back from his neck to his feet, and thereby permanently injured, to his damage in the sum of $15,000, for which he prayed judgment.

The defendant answered, admitting that it was a corporation engaged in interstate commerce, but denied that plaintiff, at the time of his injury, was engaged in interstate commerce, and denied the allegations of negligence as specifically as they were alleged, and admitted that the plaintiff was in the employ of the defendant, and alleged that plaintiff was operating an engine in defendant's yards at North Little Rock, and that plaintiff negligently ran his engine against another engine, when plaintiff could have avoided the same by the exercise of ordinary care. The defendant alleged therefore that the plaintiff was injured by his own negligence, and that the plaintiff assumed the risk. The defendant also admitted that the plaintiff was injured, but denied that he was injured to the extent alleged in his complaint. The trial resulted in a verdict and judgment for the appellee in the sum of $5,500, from which is this appeal.

1. It is first contended by the appellant that the evidence is not sufficient to sustain the verdict. The facts are substantially as follows: A blue-print of a

plat was prepared by a civil engineer showing the location of appellant's tracks at Baring Cross, from the north abutment of its bridge over the Arkansas River to a point 1,500 feet north, which embraced appellant's roundhouse tracks and shop tracks. The blue-print shows all the tracks as they are located. It is impracticable to bring into this record a copy of this blue-print, which the jury had before it and which was used by the witness who prepared it, and others at the trial, in explaining the location of the tracks, roundhouse, bridge, switches, and showing the points, directions and distances incident to the occurrence under investigation. A copy of this blue-print is attached to the appellant's brief, and has been found useful to the court in considering the testimony of the witnesses concerning the movements of the engines and their collision, which resulted in the injury of which appellant complains.

The appellee was in the employ of the appellant as a hostler, whose duty it was to operate a switch engine on appellant's tracks in its North Little Rock yards. He had been in appellant's employ about twelve years, and had been engaged in hostling at the time of the accident sixteen months. He was thirty-four years of age. The appellee, at the time of the accident, had in charge engines numbered 9320 and 1505. These engines were fastened together at their front ends, and appellee was backing No. 9320 and pulling No. 1505, taking the same to the Fort Smith crossing to be hooked onto a train for Fort Smith. Both engines were ready for service. Coming out of the roundhouse, appellee went down to what is known as the "cross-over," where he would have to throw a switch to get on the cross-over track. After he got there, he would have to throw another switch to get on the south main line, and then, before he could get from the south main line to the north main line, he had to throw another switch. Appellee was going in a southerly direction. There was nothing to obstruct the view of the appellee in passing over the cross-over track on to the south main line, unless the engine itself obstructed

it. The switch stands at all the switches had lights on them, red on one side and green on the other. The green light indicates that the main line is open and the red. light indicates that the switch is open. A man coming out, as the appellee was, when he looked at the switch lights could tell whether the track was open for him or not. The train that engine No. 1505 was to take out of the yards to Fort Smith was bound for Kansas City. It was an interstate train. The accident occurred at 8:55 P. M. August 20, 1924. The appellee had a helper named Dean, whose duty it was to take coal and water, and line (that is, throw) the switches for the hostler so that appellee could pass from one track to another. When appellee was about ready to start from the round-house with the engines, he told his helper that the passenger train was due pretty soon, and they would have to hurry, and he directed his helper to go line the switches. Appellee looked ahead, and his helper was standing right at the cross-over, and gave the appellee a highball signal to come ahead. Appellee proceeded to the cross-over track, and stopped right on the points. At that time he saw the other man enter on the bridge south. Appellee's helper walked up to the engine and asked if that wasn't the passenger train. Appellee looked ahead, saw it had a lantern on the pilot, and knew it was no passenger train. It was some other man from over the river bringing an engine. When appellee saw this man, he stopped his engine and told his helper it was a hostler coming over the river, and to go up there and throw the switch and flag him so that appellee could get out, and the other man could come in and get out of the way of the passenger train. Appellee knew the other engine was coming—it had a big headlight—but sent his helper to flag it. Appellee's helper did not flag appellee to come ahead, and he didn't flag the other man down. The last time appellee saw the light it was green, but he told his helper to go down there and turn it red. Appellee could see the headlight on the other engine plainly, and the other engineer could also see appellee.

It was the duty of appellee's helper to line up the switches and signal appellee to come on. He generally would go up there and line them all up and signal appellee. It was the duty of the helper, if there was any danger ahead, to tell appellee, but he didn't do so. It was appellee's duty to stop, and he did stop. Appellee saw the other man coming, and tried to beat him across the track. Appellee had a man out there to stop him, and appellee was going real slow—barely moving. Appellee was familiar with the rules of the company. Appellee could see over the end of the engine, except when he got on a curve; then he could not see. In going in these switches appellee had gone in there just as it had been done for the last five years. Other hostlers did the same. Appellee had instructions from his superior to that effect. The helpers, every one of them, got out there and would have to throw these switches. If this were not done, appellee could not get trains out. After this custom had gone on for a long time, they put up a bulletin to give the hostlers more chance to get out.

As soon as appellee's helper stepped off of the step, and, as he was going to the switch, appellee grabbed the whistle and sounded the other man down. As appellee looked out, his helper was stooping down making the switch, and, as appellee saw him do that, the tank of appellee's engine projected, and the switch light was thrown close to the line, and appellee could not see the switch light. As appellee's helper stooped down to throw the switch, the appellee was sure he threw it before he straightened up. Appellee started forward, and saw that the other man, whom he had told his helper to flag, did not stop. Appellee then put on air, reversed his engine, and started getting out of his way. The other man didn't stop. He was coming so fast appellee could not move fast enough to get out of his way, and appellee's tank projected out just enough to stop his engine, which came right by the cab. Appellee was standing in a position (which he indicated) trying to unhook the whistle cord to blow the whistle, but could not do so, and

the cord broke. About that time the other engine came by and broke some part of the pipes, and the steam struck appellee in the back and blew him out of the cab. It knocked appellee unconscious, and, when he came to himself, he was about twenty or thirty feet down the embankment. Appellee could not tell at what rate of speed the other man was coming, but he must have been moving pretty fast. Appellee had reversed his engine and had not had time to get up speed. He had moved his engine about a car-length from the place where he was when he saw the other man. The other engineer had ample time to stop his engine, after he saw where appellee was, if he had had his train under control. The other engineer could see appellee if he was looking out. Appellee could have stopped a 100-car train in that space. If the other man was taking cars to the Cotton Belt, he had to keep going on the northbound track until he got to the Cotton Belt Junction, a mile and a half away from where the accident occurred.

On May 23, 1924, the following bulletin was posted: "Effective May 25, switch tenders will be taken off at roundhouse lead at Little Rock. All trains will approach this cross-over under control." Having a train under control means being able to stop any distance where the engineer could see a rail broken; to have such control that the train could be stopped within the shortest time necessary in an emergency.

There was read to the jury the following rule of the company: "Rule 104A. A switch must not be closed for main track while a train, engine or car is outside of clearance point of the siding. Both switches of a cross-over must be open before a train starts to make a cross-over movement. Neither switch of a cross-over between two main tracks must be closed for a main track while a train, engine or car occupies such cross-over. A train entering a siding or moving through a cross-over between main tracks must not stop to pick up a man at switch while any part of train is between switch and clearance point of siding or between switches of the cross-over."

The bulletin posted on May 23, 1924, said nothing about rule 104, but it supersedes it, because it says, "Effective May 25, switch tenders will be taken off at roundhouse lead." They used to keep some of the old men there to throw the switches for the switch tenders, and the bulletin meant that these were to be taken off and the hostlers would have helpers to throw the switches.    In North Little Rock all trains must approach the cross-over under control.    The bulletin doesn't say anything about rule 104.    The bulletin means that you were to go so slow you wouldn't hit anybody, and that superseded rule 104. Appellee's superior, the switching foreman, never told appellee not to obey rule 104, but he did tell appellee that the bulletin was put up there for the protection of the engineers, and for appellee to go right on out and get on to those switches ahead of other hostlers, all switch engines, and everything except passenger trains.    When appellee got in a position where he could not see the switch stand, it was a danger sign, and was a signal for appellee not to come on until his helper flagged him. There was no signal that appellee could not see, but he had sent his helper there for the purpose of throwing the switch, and appellee was positive that he had done it. Appellee went on the main line without a signal from his helper.    He expected his helper to throw the switch and flag the other man down.

The above is substantially the testimony of the appellee himself.

Another witness testified for the appellee, among other things, as follows:    An engineer operating an engine going across the bridge north, from the time he left the bridge, could have seen an engine in the daytime coming towards the cross-over at the time it left the lead from the roundhouse, and in the night time he could not see so far.    If he had his engine under control, he could have seen an engine at the cross-over in time to stop before striking him.    This witness further testified: "If I was going along the main line like this party there, taking the cars to the Cotton Belt Junction, and the

switches were lined up for me, I would go ahead, but I would run under control. That would mean that I could stop if some one else got in the way." And further: "According to the rules that have been in force since they changed the helpers to white helpers, they hold the helpers somewhat responsible. That is, for lining up the switches and carrying out the instructions of the hostler. If the hostler told the helper to go in front of him and throw the switches, it would be the helper's duty to obey the hostler. The hostler takes signs and signals from the helper. If the helper flagged a hostler to stop, it would be the hostler's duty to stop."

Another witness for the appellee testified that the train that was to be taken out by the engine operated by the appellee was a train to Kansas City all the way through—it was billed for Van Buren, from there to Coffeyville, and on through. This witness further testified: "If a man is coming along the main line, and the switches show green, that indicates that the main line is open, which means that he can pass on, and if some one was not down there throwing the switch, he would have the right to go ahead. If the other man didn't throw the switch or flag him to stop, he would have the right to proceed. If I were a helper and the hostler told me a train was coming, and for me to go and throw the switch and flag him down, it would be my duty to do it."

H. A. Dean, a witness for the appellant, was asked to tell the jury how the accident occurred, and in answer stated: "We came out of the roundhouse intending to go to the crossing with two engines, with a switch engine and road engine, and we had the switch engine in the lead, and came up to the switches—to the cross-over switches. I lined the first switch and started for the second switch, and I saw this other engine coming across the bridge, and I didn't line the switch. I walked back and asked Mr. Barry if there were any passenger trains due. He said, "No, that is a hostler coming across the bridge," and he said, "Go ahead and throw that switch,

and we will go out ahead of it.'' So I walked back up a little, and I saw he was coming. I wouldn't give him a signal to come on out, and I wouldn't throw the switch, and he came out, and he came up, and he stopped his engine even with me, and he was at the cross-over at the time, and he told me to go and throw the switch and let's get out ahead of him, and at the time he was going out into the cross-over. I gave him a stop signal, and he stopped the engine even with me. I crawled up in the gangway of the engine and told him that that man wasn't going to stop, and that I wasn't going to throw the switch, and he kept moving on back, and asked me to go ahead and throw the switch; about that time they hit.''

Further along in his testimony Dean was asked why he didn't flag the other fellow, and answered, ''I flagged Barry, and it was right out there where they could all see it.'' He was then asked, ''Didn't you flag the other fellow?'' and answered, ''One stop signal—it would have been just the same if I had flagged.''. He further stated that he was standing between the two main lines—didn't know whether the other fellow could see him or not. There were no obstructions. He gave the stop signals. This did not necessarily signal the other fellow. He was asked why, and answered, ''If you are out on the railroad, and a stop signal is given, it necessarily means that any fellow that sees it stops.'' This witness further testified that it was his duty to obey the hostler's instructions, and that the appellee told him to go out there and line the switch, and he refused to do it. This witness, further on in his testimony, in answer to questions propounded by appellee's attorneys, stated that appellee had told witness to line up the switch and they would get out ahead of the other man. He didn't remember that the appellee told him to flag the other man, but stated, ''If I had flagged the other fellow and he had obeyed my signal, I expect that it would have prevented the accident.'' Witness saw the other fellow coming, and heard what he thought was the appellee reversing his engine when witness jumped off the engine.

We have set out the testimony of the appellee and other witnesses tending to corroborate him and tending to support the verdict, and also excerpts from the testimony of the witness Dean for the appellant, which tends to sustain the verdict. We have set forth the testimony of the appellee and portions of the testimony of other witnesses tending to sustain the verdict and have not set forth the entire testimony in detail of appellant's witness Dean and other witnesses for the appellant, tending to show that the verdict was contrary to the evidence, for the reason that it is the established doctrine of this court not to set aside the verdict of a jury where there is any substantial evidence to sustain it. In determining whether the evidence is sufficient to sustain the verdict, it is our duty to give the evidence its strongest probative force in favor of the verdict. It is likewise a familiar and unvarying rule that the jury are the sole judges of the evidence and the credibility of witnesses. Applying these rules to the testimony above detailed, we are convinced that it was sufficient to sustain the verdict.

It may be conceded, for the moment, that the above testimony and other testimony for the appellant, not set forth in this opinion, was sufficient to prove that the appellee was guilty of contributory negligence, but this is not sufficient, under the Federal Employers' Liability Act, to prevent recovery by the appellee, provided the testimony was sufficient to justify the jury in finding that other employees of the appellant were likewise guilty of negligence which concurred proximately in causing the injury to appellee. Conceding that the testimony in this record is sufficient to warrant a finding that the appellee was guilty of contributory negligence in disobeying the rules of the company above set forth, which were made for the protection of its employees, the testimony was certainly sufficient to prove that the employees operating the engine which collided with the engine operated by the appellee, as well as the appellee's helper, were guilty of negligence which concurred with the negligence of the appellee, and that their concurring negli-

gence was the proximate cause of appellee's injury. The testimony warranted a finding that the hostler operating the northbound engine at the time of the collision was violating the rule of the company, shown by the bulletin, set out above, requiring that "all trains will approach the cross-over under control."

The testimony tended to prove that, if the engineer on the northbound engine had had his engine under control at the time he approached the cross-over, the accident would not have occurred, notwithstanding the contributory negligence of the appellee, if any, in violating the rule of the company set forth in rule of the company No. 104A, above. Likewise the jury might have found that, if the engineer of the northbound engine had kept the proper lookout, he could have seen the flag which appellee's helper had put out for the appellee, as it was "right out where all could see it," and likewise the stop signal given by the appellee, which meant that "any fellow that sees it stops." The appellant contends that the appellee, in going on to the cross-over until his engine got so far on the main line that the northbound engine collided with it, was guilty of contributory negligence, because rule 104A forbade appellee going upon the cross-over as the switch lights were turned against him. But the appellee himself testified that, when he saw the other engine, he stopped his own engine, and looked to see what it was, and told his helper that it was a hostler coming over the river, and for him to go up there and throw the switch and flag him, so that appellee could get out ahead, and the other engine could come in and get out of the way of the passenger train. The appellee saw the other engine entering the bridge and saw that it was not a passenger train, and he contended that he was violating no rule of the company in running his engine over the "cross-over switch" in the manner he was doing at the time of his injury, but that, on the contrary, it was his duty to "go right on out and get on to those switches ahead of other hostlers, all switch engines, and everything except passenger trains." There was testi-

mony tending to prove that, if rule 104A of the company forbade this, it had been abrogated by habitual disregard of the rule in the manner .appellee was doing at the time of the accident, so long continued as to justify the inference that appellee's superior officers charged with the enforcement of the rule must have had knowledge of its violation, and that they had consequently acquiesced therein.

Now the testimony shows that it was the duty of the helper to obey the directions of the hostler. The helper, Dean, himself testified that such was his duty. Then, unless some rule of the company forbade the appellee from going upon the cross-over switch, it was the duty of the helper, Dean, to obey the directions of the appellee "to go ahead and line the switches and flag the engineer coming from across the river." The jury might have found that Dean, the helper, failed to discharge his duty in this particular, and that this failure so to do was negligence which concurred with the negligence of the engineer on the northbound engine. Therefore, even if the appellee himself might have been guilty of contributory negligence, the jury were clearly justified in finding from the testimony that the engineer on the northbound engine, and likewise appellee's helper, Dean, were guilty of negligence, which, concurring with the negligence of the appellee, was the proximate cause of the injury. Furthermore, the appellant is in no attitude to complain here that the undisputed testimony shows that the appellee, at the time of his injury, was operating his engine contrary to such rule. The appellant did not take this position in the court below, but, on the contrary, under proper prayers for instruction, asked the court to submit to the jury the issue as to whether this rule of the company had been abrogated, and, if not, whether the same had been violated, which prayers for instructions the court granted. It is therefore wholly immaterial, under the Federal Employers' Liability Act, whether or not the appellee was guilty of negligence which contributed to produce the injury. In § 3 of that act it is

provided, among other things, as follows: "The fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employees." This statute, says Ritchey, "rejects the common-law rule and. adopts another deemed more reasonable. Under this clause, it has been held that contributory negligence does not, in any case, defeat a recovery, but only diminishes the amount of damages." Ritchey on Federal Employers' Liability Act, p. 152, § 64. Numerous Federal and State cases are cited in notes to support the text, among them *St. Louis, I. M. & S. Ry. Co.* v. *Sharp,* 115 Ark. 308, 171 S. W. 95, where we said: "Under that statute, contributory negligence does not bar recovery, whether it be the violation of the rules or some other act of negligence."

As we view the testimony and the above authorities, the appellee is entitled to recover, even though he him- self was guilty of contributory negligence. But it occurs to us that the testimony was sufficient to warrant the jury in finding that the appellee was not guilty of contributory negligence.

The appellee testified that he directed his helper "to line the switches and flag the other fellow," and that his helper went forward and was "stooping down making the switch" when appellee's engine went upon the cross-over. The helper passed out of sight of appellee, because the tank of his engine obstructed his view, but the helper was supposed to have thrown the switch. This and other testimony of appellee made it a question for the jury as to whether appellee was guilty of contributory negligence.

The testimony was sufficient to warrant the jury in finding that the appellant, at the time of the injury to appellee, was engaged in interstate commerce, and that the appellee at that time was also engaged in such commerce. He was moving an engine which was to pull a freight train of appellant in which there were cars bound for destination outside of the State. These,

together with the measure of damages applicable in such cases, were issues of fact for the jury, and were submitted under correct declarations of law, which we have carefully examined. It would unduly extend this opinion to set them out and comment upon them.

2. Counsel for appellant asked skilled engineers and an experienced foreman of a wrecking crew questions which elicited their opinion as to the manner in which the collision occurred, from their observation of the crossover, the marks on the engine, and the blue-print drawing representing the two engines and the cross-over. The subject-matter of these questions did not call for the opinion of experts. The facts of the occurrence were not beyond the knowledge and experience of any ordinary man to understand and draw conclusions from them, when detailed by eye-witnesses. Therefore the expert testimony was not competent, and the court did not err in so holding.

3. The court, in the first instruction given at the instance of the appellee, told the jury, in effect, that, if the appellee was injured while his engine was engaged in interstate commerce, and his injury, in whole or in part, resulted from the negligence of appellant or any of its agents or employees, then the verdict must be in favor of the appellee. The only defect in the instruction is that it omitted the submission to the jury of appellant's defense of assumption of risk by the appellee. But the appellant, while making specific objection to the instruction on various other grounds, did not object to it on this ground. Therefore this objection was waived by the appellant. Furthermore, other instructions correctly submitted this issue, and the court told the jury, in an instruction on its own motion, that all the charge must be taken and considered as a whole; that none of the instructions could be considered singly.

General and specific objections are made to all the instructions that were given by the trial court, and likewise objections were made to the rulings of the court in refusing certain prayers for instructions asked by the

appellant and in modifying and giving certain prayers as modified. We have carefully examined all of these objections, and find no errors in the rulings of the court in its charge to the jury. Taken as a whole, the charge fully and correctly stated all the issues presented by the pleadings and the testimony adduced to sustain the respective contentions of the parties. The charge announced familiar principles of law, and no useful purpose could be subserved in setting out and commenting upon each particular instruction in detail.

4. The verdict was not excessive. The physician who treated the appellee testified that he was burned from his shoulders to his buttock. An X-ray picture showed that one hip was higher than the other, and that there was a deformity of the pelvis—a small callus on the right side—showing that appellee had an injury of the pelvis and backbone. The deformity of the pelvis would always remain. The witness could not say that this injury was caused by the accident. The appellee's testimony, however, showed that, when the pipe on the engine was broken, the steam blew him out of the cab, knocking him unconscious. He could not move for ten days—had to lie on his stomach and chin. His back and right leg still hurt him. He could not do as much now as he did before the accident. He was strong and healthy before the accident—weighed 180 pounds, and now weighed 144 pounds. The jury might have found from the testimony of the appellee that the injury to his back and pelvis was the result of the accident. Appellee's sufferings were most intense. Certainly it cannot be said, under these circumstances, that the amount of the verdict was excessive.

The record as a whole presents no reversible error. The judgment is therefore affirmed.

MEHAFFY, J., not participating.