Alfred WRIGHT et ux *v.* Bobby Dan FLAGG

74-6                                          508 S.W. 2d 742

Opinion delivered May 6, 1974
[Rehearing denied June 3, 1974.]

*Simpson & Riffel*, by: *Kirby Riffel*, for appellants.

*Burris & Berry*, for appellee.

J. FRED JONES, Justice. Alfred Wright and wife sued Bobby Dan Flagg for personal injuries and property damage growing out of an automobile collision. Flagg filed a counterclaim for damages and a jury trial resulted in a judgment in his favor. On appeal to this court the Wrights contend that the trial court erred in excluding from the evidence the proffered testimony of Stanley J. Klein who qualified as a consulting engineer and expert on forensic engineering from Rochester, New York.

The facts appear as follows: About dark on the evening of November 9, 1970, Mr. Wright was driving his 1960

Chevrolet automobile west on Highway 90 and his wife was riding in the automobile with him. Mr. Flagg was driving his pickup truck east on Highway 90 and the two vehicles collided south of the center line of the highway where Wright had driven his automobile with the intention of obtaining gasoline from pumps in front of Jackson's Grocery store located on the south side of the highway.

As already stated, the collision occurred on November 9, 1970. Sergeant H. E. Turner investigated the accident for the state police and on November 11, 1970, he prepared his report including a diagram of the scene of the collision. When the case was finally tried on July 23, 1973, the Wrights called Mr. Klein as an expert witness. Mr. Klein's testimony was objected to by Flagg's attorney and the objection was sustained by the trial court.

In his proffer of proof Wrights' attorney explained that Mr. Klein had examined photographs made of the two vehicles soon after the collision; that he had examined the diagram prepared by Sergeant Turner as a part of his police report, and had also examined a survey map showing the elevations and contour lines of the roadway. The record then appears as follows:

"I was going to ask Mr. Klein if he had an opinion, based upon a reasonable degree of scientific certainty, after his factual analysis, as to the position of the Wright-Flagg vehicles immediately before and during the collision—excuse me, as to the speed of the Wright-Flagg vehicles before the collision, and he was going to say that he did have an opinion, and I was going to ask him to state that opinion, and his opinion would have been that due to the way the police diagram showed the cars were faced and the position the cars came to rest, that it would have been impossible for the Wright vehicle to have been moving at the time of the collision. That even supposing that this accident happened in the traffic lane, or supposing that it happened just on the shoulder of the road, in either event, if the Wright car had been moving forward at a speed of ten to fifteen miles an hour, or in an angular direction, that the forward thrust of the car would have been converted by the laws of physics and the laws of motion into a force which would

have spun the rear of the vehicle in a southerly direction upon impact, and I would like to ask Mr. Klein to explain that.

MR. KLEIN:

The force of force is expressed in terms of magnitude and direction and their application in relation to the center of gravity of the automobiles. Any force that acts through the center of gravity has no effect at all in doing anything but producing loose linear motion. If the force acts to one side of the center of gravity, then the force creates a curvalinear motion and produces a so-called movement about the center of gravity. And the reason for this is you have Newton's law involving inertia that a body at rest will remain at rest unless acted upon by a force. If it is acted upon by a force and doesn't go through the center of gravity, it will tend to rotate in one direction or another. An angular motion of the Wright vehicle caused by its turning would have had the effect of rotating it counter-clockwise, which did not happen, so we could not have had a turning movement, because it would have produced a final resting place contrary to where it was found. As it was, the impact of the Flagg blow to the Wright vehicle was a glancing blow, and the Wright vehicle, being stationary, had no contributing kinetic energy, its inertia, acting at its center of gravity, resisted displacement. Therefore, the Flagg vehicle rotated clockwise and ended in a rearward displacement. This was a high speed impact by the Flagg vehicle striking the right front portion of the Wright vehicle, which was not moving, that deformed the soft body metal of the Wright vehicle by the heavy frame components of the Flagg vehicle. All of the kinetic energy of motion was dissipated three ways, by braking road friction, deformation of the body metal, and the remainder by the displacement of the vehicles after impact until they came to rest. We had a conversion of speed into energy of heat and motion."

Wrights' attorney stated that upon assumption of the truth of Flagg's testimony in his deposition, to the effect that Flagg was traveling at a speed of 40 or 45 miles an hour and the Wright automobile was traveling at a speed of 10 to 15 miles an hour and Flagg hardly had time to "hit the brakes"

when the collision occurred headon, Mr. Klein would have testified that in his opinion the collision could not have occurred in such manner. He said he would also have questioned Mr. Klein upon the assumption that Flagg was proceeding down the highway at 35 to 37 miles per hour and the Wright car was waiting to make a left turn and that as he reached a point just before the store, the Wright car turned immediately in front of him, not leaving time for him to stop or swerve out of the way; and, Mr. Klein would have testified that in his opinion the collision could not have occurred in such manner based on his inspection of the damage done to the automobiles as shown by the photographs of the two vehicles, which show that it was a headon collision of the right from of the Flagg vehicle and "even more" right front of the Wright vehicle. That the damage to the automobile disclosed disfiguration of the metal which by the laws of physics indicates it was not an angular collision. The attorney then stated:

"There is a clear scar along the side of the Wright vehicle clearly left by the bumper of the pickup, clearly indicating a headon collision in that manner, and other things."

Under questioning by the court Mr. Klein testified that he first made an on-sight examination of the area where the collision took place in July, 1973. He said he had never had an opportunity to actually see or examine the vehicles involved, but only had an opportunity to examine photographs of the vehicles. Mr. Klein also stated he had no records as to whether any work had been done or any changes had been made in the highway surface or shoulders of the parking area in the vicinity of where the collision took place between the date of collision and when he viewed the scene in 1973 in preparation for testifying at the trial.

The plaintiff-appellant, Mrs. Wright, testified that her husband picked her up from work in Pocahontas at the close of the workday about 5:45 p.m. and that they were driving out Highway 90 on their way home when the collision occurred. She said her husband remarked that he needed some gasoline and "he turned and crossed the road and pulled off of the highway and stopped, and I said, 'while you are getting gas, I will get some groceries.' " Mrs. Wright said that another automobile was stopped at the gas pumps and that after her husband turned from his proper traffic lane on the

north side of the highway, he drove across the mid-line and across the opposite eastbound traffic lane on the south side of the highway and parked his automobile parallel with the highway and approximately 12 to 18 inches from the edge of the highway. She said her husband parked his car next to a pickup truck which was already parked and which she thinks belonged to Bob Jackson, the owner of the grocery store. She said the other automobile at the gas pump as well as her husband's automobile had their lights on and that the two automobiles were facing each other. She said her husband stopped his automobile with the intention of moving on to the gas pump in the place where the other automobile was then parked after it had moved away from the pump. Mrs. Wright said as she started to get out of the car, she remembers turning back to get something out of her purse and does not remember anything else at all until she was being pulled from the automobile after the collision. She said she was then taken to the hospital.

Mr. Flagg testified that he was 41 years of age and after relating his activities for the day in question, he testified that he was driving about 35 or 40 miles an hour as he approached Jackson's Grocery store and was involved in the collision. The record as to the pertinent portion of his testimony is as follows:

"Q. Will you just, in your own words, just tell the Court and the Jury exactly what happened the best you can recall?

A. Yes, sir. As I approached the store there is a little grade, and it was dusk dark, and as I come upon this grade there was a car meeting me on my side. I immediately applied the brakes, but there is a curve there as well as a hill, and when I applied my brakes, I applied them hard enough that I couldn't steer it, couldn't turn it, and consequently, I let up on them trying to steer it, then I applied the brakes again, but there wasn't any way for me to get on the other side of the road and dodge the car.

Q. All right, what did the car in front of you do?

A. I was following a car and I just saw his tail lights as

he went over the hill, his brake lights come on and he swerved and the next thing I knew then this car was coming over the hill on my side of the road.

Q. What did you do then?

A. That is when I applied the brakes.

Q. Did your brakes catch, or do you recall?

A. Yes.

Q. What happened after that?

A. Of course, I was thrown out of the truck, knocked out, and when I come to Harvey Hill was standing there raising me up, and he just run and got his car and come on around and picked me up and took me to the hospital.

\* \* \*

Q. Could you indicate for the Jury about where you were when you first saw the Wright vehicle and where it was?

A. I was just approaching where the gas pumps are.

Q. This area?

A. Here.

Q. Where was the other vehicle?

A. The Wright vehicle?

Q. Yes.

A. It was almost in the center of the road but it was turning off to come into the driveway.

Q. Where was the car that was between you that you mentioned?

A. It went off on the shoulder over here on the righthand side and went around.

Q. Went around this way?

A. No, the other way.

Q. Went around this way?

A. Off on the shoulder there.

Q. All right, what transpired from then on?

A. All I did then was just to set down on my brakes and hope that he would be off the highway by the time I got there. At that curve there I couldn't turn it to get on his side of the road and I was hoping my brakes—that I could get broke down in time to let him get off the highway, but it didn't look like he made any attempt to get off the highway, he was coming right onto my side.

Q. All right. Could you tell us where, with reference to the center line of the highway, the collision occurred?

A. I would say within eighteen inches of the center line.

Q. On which side of the road?

A. On my side of the road."

Mr. Herbert Turner, a sergeant in the Arkansas state police, testified that he investigated the collision. He said there were "no-passing" markers in the center of the highway at the scene of the collision. He said there was 28 feet of skid marks and 37 feet of tire marks all together next to the center line of the highway and in the "lane of traffic coming into town." He said the skid and tire marks were practically straight on the highway and led to debris scattered over the south side of the highway. He said that after he had completed his initial investigation at the scene of the accident on the evening it occurred, he went to the Randolph County Hospital where he talked with Mr. Wright. He said Mr. Wright stated that he was turning left from the highway toward Jackson's Grocery to get some gasoline; that he was

almost off the pavement and was going about 10 to 15 miles per hour when the collision occurred. He said he talked with Mr. Wright again the following morning and that at that time Mr. Wright told him he was about half off the pavement when the collision occurred, and that his automobile was knocked back by the force of the impact.

Jesse Williams testified that he was visiting relatives and was sitting on a counter in Bob Jackson's store when the collision occurred near the front of the store. He said he heard tires skidding on the pavement and as he looked out the window of the store, he saw a pickup truck skid past the gas pumps in front of the store and he heard the impact of the collision. He said he went outside of the store to the scene of the collision and he then testified as follows:

"A. The pickup truck was setting cross-ways of the road with the hood up and the door open, I believe, and the car with the door open and Mr. Wright was trying to drag his wife out of the car. I tried to help and he wouldn't let me, he got her out and I ran back in to call assistance.

Q. We have stipulated that the diagram the police officer made showing where the vehicles were when he got there—can you understand that diagram?

A. Not entirely, I don't understand which one is which.

Q. Assume that this is the grocery store and this is a house south and that V-2 is the Wright vehicle and V-1 is the Flagg vehicle and that these points to where the vehicles came to rest, and that this is the center line of the road, is that approximately where the vehicles were when you saw them, do you agree with that?

A. No, sir.

Q. Where were they?

A. Is this the center line of the road?

Q. No, sir, this is the center line.

A. No, sir, I believe the truck was farther back here, and the car, at that time, was on the edge of the road and the back end was farther out than the front end too onto the pavement, if I remember correctly.

Q. So you disagree slightly with this diagram?

A. Yes, sir, a matter of a few feet, but possibly—now, we moved the pickup to allow traffic to flow through. I say 'we'—there was some other help come up and moved it. There was one, possibly two, cars waiting to get through from Pocahontas.

Q. Would it have been difficult for a car following the Flagg car to get by the scene of the wreck without stopping?

A. I would think so, I don't see how they could have.

Q. Did you notice any debris at the scene of the accident apparently left by the cars colliding?

A. Well, there was glass on the pavement and also off to the side of the pavement.

Q. Some on the pavement and some off?

A. Yes, sir.

Q. On which side?

A. It would be the side the store is located on.

Q. Toward the store, okay. Did you notice any skid marks on the road?

A. Yes, I did.

Q. Can you tell me in your own words where those skid marks were located?

A. They started in the neighborhood of where the gas pumps are located and the skid marks were still going to where—to about where they had the collision.

Q. Did one or both skid marks leave the road?

A. I think so. Of this, I am not certain, but if I remember correctly, the side toward the store was off the road.

Q. One skid mark left the road and the other was on the road?

A. Yes, sir.

Q. At about what point did they leave the road?

A. It has been so long I can hardly remember just where they did go off, but I would say possibly just past the front of the store, not much if any."

Dorothy Elizabeth Hawler, a registered nurse and anesthetist, testified that she was on her way to the Randolph County Memorial Hospital on an emergency call and she observed the collision involved in this case. She said the pickup truck passed her car as she came from her driveway on the highway and that she followed the truck to the point of collision. She said she was preparing to go around the pickup truck but as it was approaching a curve, she saw the lights from another car approaching from the opposite direction. She then testified as follows:

"A. . . . [I]t has been so long that I can't remember all of the details, but I do remember seeing an automobile, I do not even remember what color it was, turn in front of this pickup truck that I was following.

Q. All right, what happened?

A. Immediately I saw either the hood of the man's car or the front end of his car jump up in the air and then all, of course, was still. By this time, I was having to swerve to get around him and I was so intent on looking to see if there was a car coming in the other lane, which I had to take to get around this accident, that I really didn't look at the accident. I just, out of the accommodation of my eye, is what I saw. I did not see the man in front of me swerve, he could have, but I did not see him do it.

Q. Did he ever get out of his lane of traffic?

A. No, sir, not to my knowledge.

Q. How far behind him were you?

A. Twenty-five feet, I am sorry to say, I was.

Q. Did you see his brake lights come on?

A. Yes, sir, I sure did."

The appellants argue that the trial court precluded the testimony of Mr. Klein because in the trial court's opinion this court "had absolutely precluded the testimony of automobile reconstruction experts, and therefore no expert testimony in this field is admissible." While it is true we have recognized that expert testimony for such purpose is looked on with disfavor, we have recognized exceptions in proper cases as hereinafter demonstrated. It is true, as argued by the appellants, there was some conflict in the testimony as to the exact location of the Wright automobile in relation to the highway and as to whether it was stopped dead still or was moving when the collision occurred, but such conflicts in evidence are properly resolved by a jury rather than by the testimony of experts.

Mr. Klein did not see the automobiles but was attempting to testify from photographs made of the automobiles which were also available to the jury. From his proffered testimony he would have resolved all doubts in favor of the appellants who called him, while basing his opinion on a diagram and report of Sergeant Turner who originally made the diagram and testified on direct and cross-examination.

We agree with the appellee that there was substantial evidence from the testimony of the eyewitnesses and Officer Turner who investigated the collision, from which the jury could have found, as it apparently did, that Wright had crossed the center line of the highway in his effort to drive to a filling station or gas pump on his lefthand side of the highway, and Flagg's pickup truck skidded practically straight into the Wright automobile while Wright's automobile was still in Flagg's lane of traffic.

The appellants rely heavily on the case of *Woodward* v. *Blythe, Adm'x,* 249 Ark. 793, 462 S.W. 2d 205, but we do not

agree that our decision in that case is in any sense controlling here. In *Woodward* the deceased was the driver of a moving automobile which collided with two other automobiles traveling in opposite directions. There was evidence that the decedent actually sustained physical injuries from the impact of both automobiles, and the question was which of the two colliding automobiles caused the specific injuries which resulted in the decedent's sudden death. We pointed out in *Woodward* that attempts to reconstruct traffic accidents by means of expert testimony are viewed with disfavor and that in the absence of anything to indicate it was beyond the jurors' ability to understand the facts and draw their own conclusions, such expert testimony is not admissible. But we held under the facts of *Woodward* that the testimony of Dr. Robbins, an expert in the field of physics, was necessary for an understanding by the jurors of the physical dynamics and causal relationships involved in the accident.

In the case of *Mo. Pac. R.R. Co.* v. *Barry,* 172 Ark. 729, 290 S.W. 942, a railroad employee sued for injuries resulting from a collision between two locomotives. In that case we said:

"Counsel for appellant asked skilled engineers and an experienced foreman of a wrecking crew questions which elicited their opinion as to the manner in which the collision occurred, from their observations of the cross-over, the marks on the engine, and the blue-print drawing representing the two engines and the cross-over. The subject-matter of these questions did not call for the opinion of experts. The facts of the occurrence were not beyond the knowledge and experience of any ordinary man to understand and draw conclusions from them, when detailed by eyewitnesses."

In *Waters* v. *Coleman,* 235 Ark. 559, 361 S.W. 2d 268, we held that the trial court erred in allowing the testimony of a police officer as an expert to reconstruct an automobile collision because the expert's testimony would have invaded the province of the jury when there were four eyewitnesses in close proximity to the accident, and where there was no evidence to indicate it was beyond the jury's ability to understand the facts surrounding the collision and to draw its own conclusions therefrom. See also *Humphreys* v. *Reed,* 234

Ark. 861. 355 S.W. 2d 281; *Henshaw* v. *Henderson,* 235 Ark. 130. 359 S.W. 2d 436; *Conway* v. *Hudspeth,* 229 Ark. 735, 318 S.W. 2d 137.

The facts in the case at bar were not complicated. They actually boil down to whether Mr. Wright drove his automobile across the center line of the highway and into the proper path of the oncoming truck driven by Flagg, or whether Mr. Wright had completed his exit from the highway and was parked parallel thereto when Mr. Flagg turned right from his proper lane and drove or skidded his pickup truck from the highway and collided with the Wright vehicle which was parked off the highway. Mrs. Wright was the only witness who testified that the Wright vehicle was off the highway and parked parallel thereto when the collision occurred. Mr. Wright apparently did not testify and Sergeant Turner's testimony is not contradicted when he said that Mr. Wright stated to him at the hospital, "I was almost off of the pavement going about 10 or 15 miles an hour," and Mr. Wright stated to him the following morning, as testified by Sergeant Turner, "He stated he was about half off the pavement and was knocked back when they hit." As a matter of fact, Jesse Williams, Mrs. Hawler, Sergeant Turner, Mr. Flagg, and according to Turner, Mr. Wright himself, all **place the Wright vehicle on the wrong side of** the highway and directly in the path of the Flagg vehicle traveling in its proper lane when the collision occurred. In the light of the rather detailed testimony of the above named witnesses, we conclude that the trial court did not err in excluding the expert testimony of Mr. Klein.

The judgment is affirmed.

FOGLEMAN, J., dissents.